# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARIUS MURPHY, : | |
|         Petitioner, : | Civ. No. 14-4268 (KM) |
| v. : | **OPINION** |
| PATRICK NOGAM, et al., : | |
|         Respondents. : | |

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

The petitioner, Darius Murphy, is a state prisoner currently incarcerated at the East Jersey State Prison in Rahway, New Jersey. He is proceeding *pro se* with a habeas petition pursuant to 28 U.S.C. § 2254. Mr. Murphy was convicted by a jury in 1997 of felony murder, robbery, aggravated manslaughter, endangering the welfare of a child, and related charges, and is currently serving an aggregate sentence of thirty years with a thirty-year period of parole ineligibility. His petition raises multiple claims ranging from ineffective assistance of counsel to errors in the trial court's jury instructions. For the following reasons, the habeas petition will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The following factual background is taken from the decision of Superior Court of New Jersey, Appellate Division, dated June 15, 1999, on Murphy's direct appeal from his conviction.[1]

---

[1]    *State v. Murphy*, No. A-2262-97T4 (N.J. Super. Ct. App. Div. June 15, 1999) (copy at ECF no. 12-23). More precisely, the decision on Murphy's appeal (*see id.* slip op. at 3) attaches and incorporates by reference the factual background from the appeal of one of Mr. Murphy's co-defendants, Michael Ricks. *State v. Ricks*, No. A-4116-96T4 (N.J. Super. Ct. App. Div. June

On September 7, 1995, Janice Gordon lived in an apartment at
69 University Place in Irvington with her two sons, two nephews
and her boyfriend, Corey Davis. The apartment was located in a
four family, two story building with two apartments on each floor.
One second floor apartment was occupied by Gordon and Davis,
the other by the Kornegay family.

Upon arriving home from shopping on the night of September 7,
1995, Gordon parked her car in front of the house, and started to
her building with her shopping bags. While doing so, she was
approached by a man wearing dark clothes. The man asked her for
a light. Gordon replied that she did not have one and proceeded up
the front porch stairs. At that time, the man grabbed her by the
neck and placed a gun to the back of her neck. He told her not to
scream.

Gordon testified that two other males then approached with masks
on their faces, one facial covering was white and the other black.
Gordon recalled that after one of the men was unable to open the
building door with her key, she was forced to open the outer door
and inner door to the apartment and was then asked "[w]here's he
at?" She pointed to the bedroom where Davis was asleep and the
man with the black mask walked into bedroom. While holding a
gun, the man bent over Davis and yelled for him to get up.

Davis jumped up and began struggling with the man with the black
mask as Gordon screamed for Davis not to fight. The second man
then walked into the bedroom, a gunshot was fired, and although
Gordon could "not really" see what was happening, she testified
that she "heard somebody fall." Next, the man with the black mask
screamed at Gordon "[w]here's the money at?" Gordon testified
that at this point Davis was lying on the floor and the baby with
whom he was sleeping awoke and sat up in the bed. Stating "I'll
get the money," Gordon went to the bedroom and gave "him"
money from a drawer. There were two people in the bedroom, the
man with the black mask and the man that had been holding her.
Gordon testified that the man entering the house, who was also the
second man to enter the bedroom, fled prior to her entering the
room.

Believing there to be more money, Gordon testified "[h]e took the
gun and pointed it at my baby and he threatened to shoot him if I
didn't give him the money." Gordon gave him the contents of her
jewelry box and said there was no more money. Gordon was

---

15, 2009) (copy at ECF No. 12-24). The Murphy and Ricks appeals were decided separately,
albeit in opinions filed the same day.

placed in the bathroom and told that she would be killed if she came out. The men then left the apartment and upon hearing the door close, she called 911 two separate times. Later that night, Gordon told the police that she did not believe that she could positively identify the perpetrators.

At trial, Gordon stated that "money [was] normally kept in the house," and that she thought Davis was getting it from drugs. Gordon also recalled that sometime in January 1996 the police showed her an array of photos and, although she "wasn't for sure if that was him or not," she selected a photo of co-defendant Murphy. She identified him in court as the individual from the photo.

On December 1, 1995, Parker was arrested on another matter in West Orange for attempted murder, robbery and other offenses, and believed that he faced a possible sentence of "life without parole" for these crimes. In exchange for a maximum term of fifteen years flat, Parker agreed to enter into the cooperation agreement with the prosecutor. According to Parker, he agreed that he "would cooperate truthfully and give any information and testify as I am at this trial." He further explained that if he did not, he "would be prosecuted for those crimes from West Orange as well as those [he] entered into on the agreement," that he could also be prosecuted for perjury and that he "would receive the life sentence." Incident to the agreement, Parker told Dennis Masucci, an investigator with the Essex County Prosecutor's Office, that defendant and the three other codefendants were his accomplices in the Davis robbery-murder case.

Parker testified that Henderson and Koonce knew that Davis was a drug dealer. Koonce "set ... up" the robbery, and Henderson got Parker to participate. Henderson thought Davis had between $30,000 to $50,000 in the apartment and "that it wouldn't be hard to get into his ... home." Parker testified that "[a]ll four of us, Mr. Henderson, Dip, as well as Kyemh and Michael," surveyed the building before deciding to commit the robbery.

On the night of the crime, Parker initially met Henderson and Koonce about a block from Davis' residence. Defendant and Murphy arrived later. The five men decided to use Ricks's gray car as the getaway vehicle. Defendant parked it down the street from Davis' apartment. The five men sat in defendant's car and Henderson distributed weapons as they all discussed how to perform the robbery. Parker had a .357 magnum, Murphy "a 322" and either Henderson or Koonce had a black gun.

It was determined that Murphy would approach Gordon, whom Koonce knew by sight, "and ask her for a light." With defendant in the car parked down the block, the other three men were to "move in," and in fact did so. Parker and Henderson had ski masks, Parker's was black, and Koonce and Murphy had handkerchiefs around their necks which were pulled up to mask their faces.

Parker stated that at the time the robbery commenced, they had been outside for about one to one and one-half hours, and up to thirty minutes of which was spent waiting for Gordon to return home after she left the building. According to Parker, Murphy approached her, asked "for a light," grabbed Gordon by the arm and placed his gun to her back of neck. Parker, Murphy and Koonce then accompanied Gordon up the stairs while Henderson "stayed downstairs" to watch the outside door. However, "he would eventually also come upstairs." When Gordon opened the door to the apartment, Koonce "ran in" and "went right to Mr. Corey Davis who was asleep at the time and drew his gun on him."

Parker testified that he witnessed a "struggl[e]" between Davis and Koonce. Thereafter, Parker took hold of Gordon while Murphy went into the bedroom with Koonce and Davis. According to Parker, Murphy "stumbled" over the two men while his gun was drawn, and it "went off at that time." Koonce then "jumped up and ran" out of the house. Within a minute, Henderson came upstairs and informed Parker that someone entered the building. Michael Kornegay testified that upon entering the building he saw "two masked men in the front doorway" and heard what sounded like a female voice saying "no foo." "Foo" was apparently Davis' nickname. Kornegay went to his apartment and called 911 and then went to the Davis apartment. There he saw Davis on the floor with his baby "right near his head."

Either Parker or Henderson threatened to kill Gordon if she did not give them the money which she gave to either Murphy or Henderson along with her jewelry. Thereafter Gordon was locked in the bathroom, and the men left. Further testimony by Parker provided that all participants wore gloves and that Gordon was "quite hysterical" and "upset" that night while she begged them not to either kill her or harm the children.

*State v. Murphy*, No. A-2262-97T4, slip op. at 3 (N.J. Super. Ct. App. Div. June 15, 1999) (copy

at ECF no. 12-23), incorporating by reference from *State v. Ricks*, No. A-4116-96T4, Slip Op. at

5-9 (N.J. Super. Ct. App. Div. June 15, 1999) (copy at ECF no. 12-24).

Mr. Murphy appealed his judgment and conviction to the Superior Court of New Jersey, Appellate Division. The Appellate Division affirmed the conviction on June 15, 1999. (*See supra;* decision at ECF no. 12-23). The New Jersey Supreme Court denied certification on November 5, 1999. *See State v. Murphy*, 744 A.2d 1208 (N.J. 1999).

Thereafter, in July 2000, Mr. Murphy filed a post-conviction relief ("PCR") petition in the Superior Court of New Jersey, Law Division, Essex County. The Law Division denied the PCR petition on August 30, 2004. On October 13, 2004, Mr. Murphy appealed the denial of PCR to the Appellate Division. On May 22, 2007, the Appellate Division remanded and ordered that the trial court conduct an evidentiary hearing regarding Mr. Murphy's ineffective assistance of counsel claims. *See State v. Murphy*, No. A-0707-04T4, 2007 WL 1468592 (N.J. Super. Ct. App. Div. May 22, 2007).

On remand, the court held hearings on April 18, 2008, May 24, 2010, July 1, 2010, and September 28, 2010. On September 28, 2010, the PCR court denied the petition. Petitioner again appealed on August 11, 2011, and on March 25, 2013, the Appellate Division affirmed the PCR court's denial of the petition. *See State v. Michael Ricks and Darius Murphy*, No. A-5959-10T3, 2013 WL 11897862 (N.J. Super. Ct. App. Div. March 25, 2013). The New Jersey Supreme Court denied certification on April 3, 2014. *See State v. Murphy*, 88 A.3d 191 (N.J. 2014).

In July 2014, this Court received Mr. Murphy's federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition raises thirteen grounds:

1. The Court's instruction on identification was erroneous since it bolstered the state's identification case without referring to any of the evidence supporting petitioner's misidentification defense.

2. Petitioner's right to a fair trial was gravely prejudiced when Lieutenant Masucci testified that, in his opinion, Victor Parker had provided truthful information about the crime, and when the prosecutor claimed in her summation that Park's story had been corroborated by their investigation.

5

3. Petitioner's right to confront the witness against him was violated when the trial court precluded counsel from asking about the circumstances of Victor Parker's arrest because that testimony could have provided crucial information about Parker's motive to falsely incriminate petitioner.

4. Petitioner's Fifth Amendment rights were violated by the prosecutor's suggestion in summation that by failing to testify or "offer a defense," petitioner was attempting to hide from the collective evidence against him.

5. The court's charge was prejudicially defective because it failed to provide any guidance to the jury on how it should assess the issue of Victor Parker's credibility with the fundamental evidential item – the "cooperative agreement" between Parker and the state.

6. Trial counsel was ineffective for not investigating petitioner's alibi.

7. Trial counsel was ineffective for not moving for a severance.

8. Petitioner was denied due process because the trial judge did not instruct the jury that petitioner was not involved in the other crimes committed by Victor Parker.

9. The prosecutor violated petitioner's right to due process by failing to disclose to the defense statements made by Keith Henderson, as part of his pitch to enter into a plea agreement, that he and Victor Parker were involved in the charged crimes and that petitioner and the other defendants on trial were not involved.

10. Petitioner was denied the effective assistance of appellate counsel.

11. Trial counsel was ineffective for failing to exercise one of his remaining peremptory challenges to excuse Juror B.D.

12. Petitioner was denied the right to fair trial and was prejudiced as a result of irregular influences during jury selection.

13. Petitioner has been prejudiced by the incomplete verbatim record of the jury voir dire and the state court erred in failing to try and reconstruct the lost record.

Respondent has filed an answer to the habeas petition stating that Mr. Murphy has failed to raise

viable grounds for relief. Mr. Fitzgerald has filed a traverse and an additional supplement to his

traverse. The matter is thus fully briefed and ripe for decision.

## III. HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV. DISCUSSION

### A. Ground One: Identification Instruction

In Ground One, Mr. Murphy argues that the trial court's instruction on identification was unfairly slanted. He contends that the instruction included specific references to the State's trial evidence on the issue of identification, but did not refer to his defense as to identification. According to Mr. Murphy, this rendered the instruction fatally defective.

The last decision on this claim was from the Appellate Division during Mr. Murphy's direct appeal. That court addressed the claim as follows:

> The trial judge's charge on identification referred to the attorney's "conflicting contentions of the State and their respective clients in their summations." Here the defense presented no affirmative evidence on identification, and the judge did not refer to the State's evidence without referring to defendant's contentions. *Cf. State .v. Edmunds*, 29 3 N. J. Super. 113 (App. Div. 1996), *certif. denied*, 148 N.J. 459 (1997). The charge does not warrant reversal.

(Dkt. No. 12-24 at p. 6.)

The question here is not whether the jury instruction was consistent with state law as such, but whether it resulted in a violation of due process standards:

> The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.... "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

*Estelle*, 502 U.S. at 72–73 (citations omitted). Most pertinently here, the Due Process Clause would be violated if an erroneous instruction rendered the trial as a whole unfair or "operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (1997). *See also In re Winship*, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt ..."); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the Constitution).

Mr. Murphy is not entitled to federal habeas relief on this claim. As the Appellate Division stated, Mr. Murphy did not present evidence in support of an identification defense; there was no defense evidence for the instruction to refer to. The court's instruction did state that the defendants, as part of their general denial of guilt, contended that the State had not presented

enough reliable evidence to prove beyond a reasonable doubt that they were the perpetrators of the crime. (Dkt. No. 19 at p. 2.) The court also instructed the jury that the State bore the burden of proof as to identification and that defendants had no burden to show that the crime was committed by someone else. (*Id.*) The instruction fairly presented the issue to the jury, did not undermine the burden of proof, and did not render Mr. Murphy's trial unfair. Based on the record, I conclude that the Appellate Division's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Ground One will be denied.

## B. Ground Two: Masucci's Testimony and Prosecutor's Summation

In Ground Two, Mr. Murphy asserts that his right to a fair trial was prejudiced by Lt. Masucci's testimony that Victor Parker provided truthful information and by the prosecutor's summation, which stated that Parker's testimony had been corroborated by the investigation. I will address those claims separately.

### 1. Masucci's Testimony

Mr. Murphy argues that Mr. Masucci's testimony improperly bolstered Parker's credibility. In particular, he points to Massuci's statements that he "knew what [Parker] was telling [him] was true" and that he found that Parker was telling the truth. (Dkt. No. 1 at p. 14)

The last decision on this claim was from the Appellate Division, which discussed it in Mr. Ricks's appeal and incorporated that discussion into its simultaneous opinion on Mr. Murphy's appeal. (*See* n.1, *supra*.) The Appellate Division addressed the claim as follows:

> In essence, it is clear that the defense did not object to testimony about, and even developed and emphasized the nature of, Parker's agreement with the State, the terms of which made clear, independent of any testimony of Investigator Masucci, that the State by prosecuting this matter and calling Parker obviously accepted Parker's testimony as truthful. As a result, independent of any lack of objection, we conclude

that any inappropriate references by Masucci to Parker's veracity could not have affected the result.

. . .

Defendant[2] claims that Investigator Masucci improperly vouched for the credibility of Parker and improperly testified as to his truthfulness. Masucci was the lieutenant in charge of the Organized Crime Section in the Essex County Prosecutor's Office who, as a homicide investigator at the time, had been in charge of the Davis case investigation.

In December 1995, Masucci was contacted by the West Orange Police Department to interview Parker who was in their custody. Parker claimed to have "information about a homicide that happened in Essex County." Masucci met with Parker and realized that the homicide he referred involved the death of Corey Davis. After receiving preliminary information from Parker, Masucci checked his criminal history.

In answering questions regarding the investigation process, the following colloquy took place during Masucci's direct testimony:

> Q: Once you received the preliminary information from Mr. Parker, what did you do?
>
> A: Once I received the preliminary, being the case agent, I knew that what he was telling me was true in that he had to be somewhat knowledgeable about it or be there for him to tell me what he was telling me because you had to be there because I knew the facts of what was going on in the case. At that time I went back, I evaluated my case, I went to my superior and explained to him the situation.

Masucci further testified that Parker entered the cooperation Agreement with the prosecutor and "limited" his prison exposure "to the 15 year term of imprisonment." In exchange Parker "had obligations that he had to be truthful at all times and if [Masucci] found him in violation of any of the agreement and anything [Masucci] found him not telling the truth in, in any of the crimes, that he would violate this agreement." Defendant acknowledges that no objection was made to this testimony.

Subsequently, still during Masucci's direct testimony, the following occurred:

> Q. Did Mr. Parker indicate that there were other individuals involved with him?

---

[2] For clarity, references to "defendant" within this excerpt speak of Mr. Ricks, not Mr. Murphy.

A. Yes. He indicated that there were four other individuals.

MR. JEREJIAN [Murphy's counsel]: Your Honor, I'm going to object to what he indicated. I don't think it is proper.

MS. GRAN [the Prosecutor]: the counsel know[s], Mr. Parker will be here.

THE COURT: Mr. Parker is going to testify. Do you want to be heard?

MR. JEREJIAN: Yes.

THE COURT: All right. Side bar.

(At side bar.)

THE COURT: All right.

MR. JEREJIAN: Judge, the scene has been set for the Cooperation Agreement, the fact that he took a statement and so forth. Perhaps the stage has been set for Mr. Parker. It is hearsay and is improper for this witness to disclose to the jury what Mr. Parker told him so that is improper. Whether she's going to call him or not call him, Mr. Parker should be the source of that evidence. Also, [Y]our Honor, I would add, although I didn't object at the time to highlight, I'm not objecting specifically as to that occurred but perhaps in terms of future questions, I wish to put on the record that this witness seems to be coming up with conclusions as to what Mr. Parker is telling him. In other words, based on what he told me, I determined it was truthful and whatnot.

THE COURT: I think that what he testified to was based upon what he knew as the agent assigned to this investigation what he was telling him was consistent with what he already knew.

MR. JEREJIAN: That's not what he said.

THE COURT: He may not have phrased it that way but there was no objection.

MR: JEREJIAN: I understand that, but in this particular case the State can proffer where she's going. If she's going to go into what Parker told him in that statement, that is completely improper.

THE COURT: I was just going to do that.

MS. GRAN: Clearly, it's my understanding that the prior identifications are an exception to the hearsay rule. I'm not going into word for word but what Mr. Parker said.

THE COURT: That he identified –

MS. GRAN: The individuals and the photo arrays.

THE COURT: I'm going to permit that. Her position is on the record.

Counsel for defendant, Henderson and Koonce said nothing.

After testifying that Parker informed him of the names or nicknames of the other four individuals involved, Masucci was asked what he did as a result of receiving that information. He responded:

I took a statement from him on this particular matter and I referred to my supervisors as to actually what happened and what he said and everything he said was consistent to, basically consistent to the statements I took from other persons, including Janice Gordon and Mr. Kornegay.

Again, there was no objection placed on the record by defense counsel.

Defendant contends that the statement of Murphy's counsel at side bar should be treated as if he voiced an objection to Masucci's testimony and that no objection was made to his statements relating to Parker's credibility on cross because of the rulings made at that side bar. On the cross-examination Masucci testified that he "investigated" the information given to him by Parker and found it to be "consistent," with what Gordon had said, that he checked the information in order to "prove that he's telling the truth," and that after investigation he decided the information could only have been known by "a participant" and "found out that [Parker] was telling me the truth."[fn.] Defendant again acknowledges that no objection was made to these statements. To the contrary, the defense was endeavoring to show that Masucci was willing to accept Parker's story without meaningful "corroborat[ion]" even though it was given to obtain a limited sentence exposure for numerous serious crimes.

[Fn.] In response to that answer counsel responded: Okay. So at first you were suspect but then you went out and you looked into it and you investigated it over a series of days ... to satisfy yourself that he was being truthful with you, is that what you're saying?

Generally, "it may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." *State v. Macon*, 57 N.J. 325, 333 (1971) (refusing to entertain counsel's rationale that objecting would have left the jury with an unfavorable impression). In the absence of an objection, defendant's argument on appeal must be considered under the plain error doctrine. *State v. Engel*, 249 N.J. Super. 336, 377 (App. Div.), *certif. denied*, 130 N.J. 393 (1991); R 2:10-2.

We find no plain error warranting reversal. There was no objection by defendant to Masucci's testimony and, in context, the defense was endeavoring to develop that Masucci was wrong in blindly accepting the story of a known liar and criminal. It was fully developed that there was never any corroboration of the identifications made by Parker to Masucci of the perpetrators involved with him, as opposed to the events which occurred, and there was no real contest that the events occurred as recounted (and corroborated) by Gordon.[fn] Moreover, given the extensive development - even by the defense - of Parker's Cooperation Agreement and plea agreement with limited custodial exposure, the jury had to understand that the indictment was being prosecuted because the prosecutor chose to accept Parker's story for purposes of pursuing the case. In any event, this is not a case in which an expert witness testified as to the credibility of the witness or suggested that, therefore, a defendant was guilty. *See State v. J.O.*, 130 N.J. 554 (1993); *State v. Odom*, 116 N.J. 65, 79 (1989); *see also State v. Michaels*, 136 N.J. 299, 323 (1994). Moreover, much of the testimony now challenged on appeal was developed on cross examination by other defendants to which defendant either objected nor moved to strike as unresponsive. *See State v. Stefanelli*, 153 N.J. Super. 452, 457 (App. Div. 1977), *rev'd on other grounds*, 78 N.J. 418 (1979).

> [Fn] Defense summations suggested different things, including that Gordon was angry with Davis for cheating on her and may have known Henderson who, despite the timing of the events in question, had intimate knowledge of Gordon's apartment, to the contention that the testimony of Gordon and Parker differed in.some respects and, therefore, the jury had to find that Parker was lying in much of his testimony.

(Dkt. No. 12-24 at pp. 5; 11-16.)

The violation of a right created by state law is not cognizable as a basis for federal habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' ") (quoting *Lewis v. Jeffers,* 497 U.S.

764, 680 (1990)). Thus, Mr. Murphy cannot obtain relief for any erroneous evidentiary rulings under state law unless they rise to the level of a deprivation of due process. *Estelle,* 502 U.S. at 70 ("[T]he Due Process Clause guarantees fundamental elements of fairness in a criminal trial.") (quoting *Spencer v. Texas,* 385 U.S. 554, 563–64 (1967)). For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *Keller v. Larkins,* 251 F.3d 408, 413 (3d Cir.2001) (holding that admission of evidence may violate due process where the evidence is so inflammatory as to "undermine the fundamental fairness of the entire trial"). *See also Cox v. Warren,* Civil Action No. 11–7132(FSH), 2013 WL 6022520, *8 (D.N.J. Nov.13, 2013).

The Appellate Division's denial of this claim was not contrary to clearly established federal law. The defense explored Parker's potential motivation to provide untruthful information in order to reduce his sentencing exposure. As the Appellate Division noted, both sides looked to Parker's cooperation agreement as a relevant factor in considering whether the information Parker provided was credible and reliable. Moreover, the Appellate Division correctly observed that there was no corroboration of Parker's identifications of the other defendants; the challenged statements offered by Mr. Massuci related to the events of the crime itself, about which there was little dispute. In addition, defense counsel, including Mr. Murphy's counsel, had ample opportunity to cross-examine Mr. Massuci and question his acceptance of Mr. Parker's information. (*See* Dkt. No. 12-7 at pp. 57-62; Dkt. No. 12-8 at pp. 7-13.) Viewing the record as a whole, Mr. Massuci's testimony did not render Mr. Murphy's trial fundamentally unfair. Mr. Murphy is therefore not entitled to federal habeas relief on this claim.

### 2. Prosecutor's Summation

Mr. Murphy also argues that the prosecutor's summation was improper because the prosecutor stated that the information Mr. Parker provided had been corroborated by the investigation and suggested that she, the prosecutor, knew the defendants were guilty.

The last decision on this claim was from the Appellate Division (again, on Mr. Ricks's appeal, incorporated in the simultaneous decision on Murphy's appeal. *See* n.1, *supra*.) The Appellate Division addressed this claim as follows:

> Defendant also argues that reversal is required because the prosecutor in her summation stated that the information received by Masucci was "corroborated." The prosecutor further stated that under the agreement Parker was subject to prosecution if the state learned that the information he gave was contradictory or false. Defendant insists that the prosecutor was therefore suggesting that she knew defendant was guilty of the offenses charged.
>
> We agree with defendant that a prosecutor cannot suggest that he or she has personal knowledge of guilt or that an investigator would not lie because of non-evidential consequences to the officer. *State v. Frost*, 158 N.J. 76, 85-86 (1999). But here the prosecutor's comments in summation were based on evidence developed at trial including testimony concerning the agreement and cross-examination directed to Masucci's pursuit of the investigation based thereon.
>
> The prosecutor's summation drew reasonable inferences from the evidence presented at trial and did not amount to prosecutorial misconduct requiring reversal. *See State v. Frost*, *supra*; *State v. Morton*, 155 N,N, 383, 458 (1998).

(Dkt. No. 12-24 at pp. 16-17.)

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Wainright*, 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is

examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Upon review of the record, I find that the Appellate Division's decision on this claim was not an unreasonable application of clearly established federal law. A prosecutor is entitled to considerable latitude to argue the evidence and reasonable inferences that can be drawn from that evidence. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). As the Appellate Division stated, the prosecutor here argued that the jury should draw permissible inferences based on Mr. Parker's testimony and how it aligned with other evidence in the case, including Ms. Gordon's testimony. Moreover, the prosecutor's summation followed and responded to the summations of defense counsel, wherein counsel disputed whether information Parker provided had in fact been corroborated. *See e.g., Darden*, 477 U.S. at 182 (noting that the "invited response" nature of the prosecutor's comment is used to determine the effect on the trial as a whole).

The prosecutor's statements did not constitute vouching in the sense of suggesting guilt based on extra-record evidence or knowledge. And the record would not support a finding that the challenged statements, even if they had been improper, would have had a substantial and injurious effect or influence on the jury's verdict.

Mr. Murphy is not entitled to federal habeas relief on this claim. Accordingly, Ground Two will be denied.

### C. Ground Three: Confrontation Clause Claim

In Ground Three, Mr. Murphy alleges that the trial court violated his right to confront the witnesses against him by precluding defense counsel from asking about the specific circumstances surrounding Parker's arrest for another offense. Mr. Murphy argues that such testimony could have provided information about Parker's motive to falsely incriminate Mr. Murphy.

The last court to address this claim was the Appellate Division in Mr. Ricks's appeal of the same issue (again, incorporated in the simultaneous decision on Murphy's appeal. *See* n.1, *supra*.). The Appellate Division discussed this claim as follows:

> During her opening statements, defendant's counsel attempted to refer to Parker's "shootout" with police before he was arrested in West Orange. She stated that Parker was arrested in December 1995 while committing an armed robbery at an A&P, and charged "with armed robbery and three counts of attempted murder on police officers because he was involved in a shootout at that location." The judge sustained the State's objection and directed the jury to disregard the statement.
>
> Defendant's attorney did not ask for a side bar or endeavor to suggest that her comment related to Parker's motive to lie in this case. Counsel proceeded to inform the jury that Parker knew he was facing a life sentence and offered information to the police including "naming names." After referring to Parker as a four time convicted criminal, in an attempt to rationalize why Parker named the names he did, counsel stated, "I don't know why he did it," "[h]e would have named his own mother if it would have meant that he would have seen the streets again. That was his motive to lie."
>
> After all opening statements were concluded and the jury was excused, the trial judge stated his rationale for allowing examination of Parker regarding the specific charges that were dismissed pursuant to the agreement while he would not allow examination regarding their underlying facts. The judge stated:
>
>> Here I would have a concern separate and apart from that, and that is that many trials here, which we would have, start getting into specific facts, would have the potential to shift the focus from the larger case, but there are at least one, maybe more, there are certain

defendants who are parties to this case that are also defendants in
other cases with Mr. Parker. It seems to me that there's a likelihood
of prejudice to the other cases involving some of these defendants
that are possible if the door is opened and we start getting into
testimony with respect to specific incidents.

If I weigh and balance the various factors, it would seem to me that
there's a potential also to mislead the jury since a number of those
charges have been dismissed, they haven't been proved by the
State, they are simply accusations, as these charges are, and as you
have also amply demonstrated to the jury today by way of your
opening statements. It would certainly add unnecessary time to the
trial of this case without adding any corollary probative value.

You certainly are free to cross with respect to the specific charges
that have been dismissed pursuant to the plea agreement but I don't
believe there's any basis to get into the specific underlying facts
with regard to those various charges, and I know that at least with
respect to Mr. Ricks, he is named in quite a few of those other
matters.[fn]

The judge recalled that defendant was "named in quite a few of those other
matters."

[Fn.] Counsel for Murphy responded that he "agree[d] with
everything" the judge said and thought it would be "improper" to
get into the facts of the other cases.

Defendant now claims that inquiry into the underlying facts of the
dismissed charges and particularly the West Orange robbery was
admissible to prove Parker's motive to fabricate the story. He contends
that:

If the defense had been able to cross-examine Victor Parker about
the facts of the West Orange case, it could have established that
Parker had a different motive for implicating Michael Ricks other
than merely reducing his own sentencing exposure. According to
Parker's guilty plea, which was marked at trial as S-26, Ricks was
also the driver of the getaway car in the West Orange robbery.
Parker testified that when the police arrived, Ricks took off in the
getaway car, apparently leaving Parker and Henderson stranded.
Parker was shot in his right wrist and then arrested. One would
assume that Parker was not at all happy about being abandoned at
such a crucial moment.

In other circumstances, development of the facts surrounding the West Orange event, as a motive for the identification of defendant and even his friends as co-perpetrators, might be warranted. But proof of involvement of Parker with defendant in another robbery or other crimes would inure to the prejudice of all defendants, including Ricks. Moreover, the facts of the West Orange robbery would prejudice Henderson who, defendant now says, was involved with Parker and him in the West Orange robbery. The evidence, even if it could somehow be fairly sanitized, would reveal that at least defendant and Henderson were involved in other crimes and in other crimes with Parker from whom they tried to distance themselves. In any event, for purposes of defendant's appeal we conclude that the judge's ruling properly balanced the relevant factors under N.J.R.E. 403, particularly in the absence of a request for severance by defendant and an explanation to the trial judge of the present claim regarding the impact of the West Orange event on motive. In these circumstances, we find neither a violation of the right to confrontation because of the extensive cross-examination about the cooperation and plea agreements, nor an abuse of the trial judge's considerable discretion under N.J.R.E. 403.

(Dkt. No. 12-24 at pp. 17-20.)

In its opinion on Mr. Murphy's direct appeal, the Appellate Division added:

As to Point III, defendant did not claim he was involved with Parker in other offenses including the West Orange robbery during which Ricks stranded Parker, and defendant did not claim Parker had a motive to lie with respect to him. Eliciting information about Parker's involvement in other crimes with codefendants on trial could have prejudiced defendant as well as them, and in any event, he did not seek a severance to pursue the issue of motive in a manner which would not have unduly prejudiced the co-defendants. Nor does he suggest how inquiry concerning the details of Parker's other crimes would have inured to his benefit. Moreover, when the trial judge ruled that there could be no development of the specific facts of crimes not a subject of the trial, this defendant's attorney said "I agree with everything that your Honor said ... I have absolutely no intention of getting into the underlying facts of the case. I think that's improper."

(Dkt. No. 12-23 at p. 5.)

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI.

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of

20

cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 678 (1986). However, trial courts may impose limits on the extent of cross-examination without running afoul of the Confrontation clause. *Id.* at 679. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*

I find that the Appellate Division's denial of the claim was not contrary to, or an unreasonable application of, clearly established federal law. The defendants were not denied the opportunity to cross-examine Parker and were permitted to inquire into specific charges that were dismissed as part of his plea agreement. They had ample latitude to explore the theme of Parker's motive to lie based on his desire to avoid substantial punishment for the criminal charges against him. The trial court did not permit inquiry into the specific facts of those crimes because doing so would have been prejudicial to certain defendants. This sort of limitation is permissible. *Van Arsdall,* 475 U.S. at 679.

In addition, Mr. Murphy's counsel agreed with the limitation, presumably for strategic reasons. And as the Appellate Division pointed out, one of the main reasons for bringing out these circumstances (revenge against Ricks for abandoning Parker at the scene of the other offense) had nothing to do with Murphy.

Mr. Murphy's Confrontation Clause claim lacks merit and does not entitle him to habeas relief. Accordingly, Ground Three will be denied.

### D. Ground Four: Fifth Amendment Claim Regarding the Prosecutor's Summation

In Ground Four, Mr. Murphy argues that his Fifth Amendment right against self-incrimination was violated by the prosecutor's suggestion that by failing to testify or offer a defense, Mr. Murphy was attempting to "hide" from the collective evidence against him.

The last court to discuss this claim was the Appellate Division (, in the consideration of Mr. Ricks's appeal (again, incorporated in the simultaneous decision on Murphy's appeal. *See* n.1, *supra*.). The Appellate Division discussed the claim as follows:

> In her summation, the prosecutor asked the jury to view the evidence presented as a whole rather than in a "vacuum," and stated that "the defense has no obligation to offer a defense." Regarding the reasonable doubt standard, the prosecutor stated that it "is not a mathematical standard, is not a scientific standard of proof, and is not a law of proof, a shield behind which a defendant can hide from the collective evidence against him."
>
> No objection was raised to these comments and, therefore, it is proper for us to infer that the comment was not perceived as prejudicial or unwarranted when taken as a whole. *State v. Macon*, 57 N.J. 325, 333 (1971); *see also State v. Frost, supra*; *State v. Ramseur*, 106 N.J. 123, 322-23 (1987); *State v. Bucanis*, 26 N.J. 45, 56-57, *cert. denied*, 357 U.S. 910, 78 S. Ct. 1157, 2 L. Ed.2d 1160 (1958). We do not read the summation as embodying an improper comment on defendant's failure to testify.

(Dkt. No. 12-24 at pp. 20-21.)

As discussed above, when reviewing a prosecutor's comments in an opening or closing statement, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "*Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974)). Even on direct appeal, a comment on defendant's silence will not be presumed; the court will not lightly infer that the jury drew the most damaging possible meaning from the prosecutor's remarks. *See Donnelly,* 416 U.S. at 647.

I find that the Appellate Division's denial of Mr. Murphy's Fifth Amendment claim was not contrary to clearly established federal law. Nor was its decision based on an unreasonable determination of the facts. The challenged portion of the prosecutor's summation reads as follows:

> When you look at the proofs before you, you don't look at them in a vacuum. You look at what the testimony of Janice Gordon tells you about the testimony of Victor Parker, tells you about the testimony of Michael Kornegay, tells you about the testimony of the physical evidence. And we know, as the Court told you, the defense has no obligation to offer a defense, to open, to ask a question but if they do, choose to do so in the course of the trial, it is subject to your scrutiny. A standard of law which recognizes proofs from all sources and expects that you will consider them as you indicated through your oath you will. A standard which is not a mathematical standard, is not a scientific standard of proof, and is not a law of proof, a shield behind which a defendant can hide from the collective evidence against him.

(Dkt. No. 12-10 at pp. 31-32.) As the Appellate Division concluded, these statements do not amount to an improper statement regarding the defendants' declining to testify and therefore do not implicate Mr. Murphy's Fifth Amendment rights. *A fortiori,* the statements did not make Mr. Murphy's trial fundamentally unfair.

Mr. Murphy is therefore not entitled to federal habeas relief on this claim. Accordingly, Ground Four will be denied.

E.  Grounds Five and Eight: Jury Charges Regarding Victor Parker

In Grounds Five and Eight, Mr. Murphy argues that the trial court's jury instructions regarding Victor Parker were prejudicial and denied him his right to due process. In Ground Five, Mr. Murphy asserts that the court's charge was defective because it did not provide guidance to the jury on how to assess Parker's credibility with respect to the cooperation agreement. In Ground Eight, Mr. Murphy claims his due process rights were violated because the

trial court did not instruct the jury that Mr. Murphy was not involved in the other crimes that Parker committed.

Generally, a jury instruction does not merit federal habeas relief merely because it is inconsistent with state law. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding, relief is available only if due process is violated:

> The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.... "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

*Estelle,* 502 U.S. at 72–73 (citations omitted). Most pertinently, the Due Process Clause would be violated if an erroneous instruction rendered the trial as a whole unfair or "operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn,* 120 F.3d 400, 416 (1997). *See also In re Winship,* 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt ..."); *Sandstrom v. Montana,* 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the Constitution).

For the reasons discussed below, I conclude that Petitioner is not entitled to federal habeas relief on these claims.

1. Ground Five

Mr. Murphy asserts that the trial court should have instructed the jury on how to determine Parker's credibility. He does not, however, state what that instruction should have

been. Mr. Murphy raised this argument on appeal by incorporating it from the appellate brief filed by Keith Koonce, one of his co-defendants. Thus, the last court to address this claim was the Appellate Division in the appeal of Mr. Koonce. That court, however, summarily denied the claim, finding that it lacked sufficient merit to warrant discussion. (Dkt. No. 12-25.)

I find that this claim lacks merit and does not entitle Mr. Murphy to federal habeas relief. Indeed, the premise of the argument appears to be invalid. The trial court did instruct the jury regarding the weighing of the credibility of Victor Parker:

> Now, Victor Parker, one of the defendants named in the indictment, has admitted his guilt and testified on behalf of the State. The law requires that testimony of such a witness be given careful scrutiny. In weighing his testimony, you may consider whether he has a special interest in the outcome of the case, and whether his testimony was influenced by the hope or the expectation of any favorable treatment or reward or by any feelings of revenge or reprisal. If you believe this witness to be credible, and worthy of belief, you have a right to convict the defendant on his testimony alone provided, of course, that upon a consideration of the whole case you are satisfied beyond a reasonable doubt of the defendant's guilt.

(Dkt. No. 12-11 at p. 8.) True, the trial court did not specifically mention Parker's cooperation *agreement*. The instruction did, however, refer to Parker's status as a cooperating witness and told the jury that it should therefore weigh his testimony with care in light of, *inter alia,* Parker's hope of favorable treatment or reward. Mr. Murphy has failed to show that the instruction violates any federal right or constitutional provision.

The Appellate Division's denial of the claim was not contrary to clearly established federal law. Accordingly, Ground Five will be denied.

2. Ground Eight

In Ground Eight, Mr. Murphy argues that the trial court should have instructed the jury that he, Murphy, did not participate in Victor Parker's other crimes. Mr. Murphy raised this issue

25

in his initial PCR proceedings. It does not appear from the record before this court, however, that the state courts directly addressed this claim. I will therefore consider it *de novo*. *Rolan v. Vaughn*, 445 F.3d 671, 678 (3d Cir. 2006) ("If the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply, and federal courts undertake a *de novo* review of the claim.").

Mr. Murphy has failed to demonstrate that the trial court's failure to instruct the jury that he did not participate in Parker's other crimes rendered his trial fundamentally unfair. To begin with, there was no evidence that Murphy *did* participate in Parker's prior crimes. As discussed above, the trial court limited discussion of Parker's other crimes by precluding evidence about the specific circumstances surrounding them. Nothing in the record implied to the jury, however, that Mr. Murphy was associated with those offenses. The trial court was not required, *sua sponte*, to officiously rebut a contention that was never made

Mr. Murphy has failed to establish that the omitted instruction was necessary or that he was prejudiced by its absence. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). Accordingly, Ground Eight will be denied.

F.  Grounds Six, Seven, and Eleven: Ineffective Assistance of Trial Counsel

In Grounds Six, Seven, and Eleven, Mr. Murphy claims that his trial counsel rendered constitutionally ineffective assistance. In Ground Six, Mr. Murphy asserts that counsel was ineffective for failing to investigate his alibi. In Ground Seven, Mr. Murphy argues that counsel was ineffective for not moving for a severance. Finally, in Ground Eleven, Mr. Murphy claims that counsel was ineffective for failing to exercise a peremptory challenge to excuse a certain juror.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir.2013). Petitioner must identify acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. The federal court must then determine whether in light of all of the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. *See id.*

Second, a petitioner must affirmatively show prejudice, which is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir.2012)."With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir.2010) (quoting *Strickland*, 466 U.S. at 697).

Additionally, in assessing an ineffective assistance of counsel claim under AEDPA, the Supreme Court has imposed an additional barrier:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a

> United States district court. Under AEDPA, though, it is a
> necessary premise that the two questions are different. For
> purposes of § 2254(d)(1), an *unreasonable* application of federal
> law is different from an *incorrect* application of federal law. A
> state court must be granted a deference and latitude that are not in
> operation when the case involves review under the *Strickland*
> standard itself.

*Harrington,* 562 U.S. at 101 (internal quotation marks and citation omitted) (emphasis in
original).

In its May 22, 2007, opinion and order on Mr. Murphy's first PCR appeal, the Appellate
Division remanded the ineffective assistance claims and ordered the PCR court to hold hearings
to dispose of the arguments. After conducting those hearings, the PCR court denied Mr.
Murphy's petition. Mr. Murphy again appealed and the Appellate Division affirmed. As
discussed below, the Appellate Division's determinations of these claims were not contrary to
clearly established federal law and were not based on unreasonable determinations of facts.
Accordingly, these claims will be denied.

    1.  Ground Six: Failure to Investigate Petitioner's Alibi

Mr. Murphy contends that he informed his attorney that he had an alibi but that counsel
failed to ask Mr. Murphy how to contact the alibi witnesses.

The last court to address this claim was the Appellate Division on Petitioner's second
PCR appeal:

> On the issue of the alibi defense, Murphy testified that he discussed the
> issue with his attorney in "August or September '95." Murphy asserted
> that when he raised the issue, his attorney "cut [him] off," telling him that
> defense counsel had agreed among themselves to "go with general denial"
> as a defense and "we [were] not going to be needing" an alibi defense. His
> attorney told him that the jury would not believe the State's chief witness,
> Victor Parker. Based on that advice, Murphy decided not to testify at the
> trial.

Murphy also testified that, in discussing a possible alibi defense with his attorney, he told the attorney that he did not know the date on which the victim had died. Murphy claimed his attorney never gave him that information. He asserted that it was only through "independent investigation" that he finally "came to find out that it was September 6, that it was the night of the incident." He also testified that, during the trial, he heard testimony that the police came to the murder scene on September 7, "so the night of the incident would have been September 6."

Murphy identified a letter to his trial attorney, dated November 25, 1996, which was four days after the trial ended. In the letter, Murphy supplied the names and telephone numbers of three people who he claimed could provide an alibi, and asked his attorney to file a motion for a new trial. Murphy testified that it was not until some time after the trial that he found out exactly when the victim had died; he tried to contact his trial attorney to further discuss alibi witnesses, but the attorney would not take his calls. He also identified a series of affidavits, all dated in the year 2000, from purported alibi witnesses.

On cross-examination, defendant testified that he obtained the affidavits after the alibi witnesses contacted him "through family members." Murphy was also confronted with a series of letters he wrote to his attorney before the trial. None of those letters mentioned an alibi defense or possible alibi witnesses. He also admitted that during the course of pre-trial proceedings, the trial judge gave him a copy of the indictment, which listed the date of the murder.

On re-direct examination, Murphy testified that during the trial, after Parker had testified, his attorney visited him in the jail and asked him to testify. According to Murphy, he again raised the issue of alibi witnesses, but his attorney told him that the defense had not filed a notice of alibi. Murphy testified that this was the reason why he waited until after the trial was over to send his attorney the list of alibi witnesses.

The State presented testimony from Edward Jerejian, defendant's former trial counsel. At the time he was assigned to represent Murphy, in 1995, Jerejian was a certified criminal trial attorney with extensive experience trying homicide cases. According to Jerejian, he developed a good rapport with Murphy and spoke to him often prior to the trial. Jerejian explained in detail the litigation strategy that he and counsel for the co-defendants developed. That strategy was to discredit Parker, the State's chief witness. Jerejian testified that Murphy agreed with that strategy, and was "adamant" about pursuing a joint defense with his co-defendants. According to Jerejian, Murphy "never" told him that he had an alibi for the night of the shooting. Jerejian also confirmed that Murphy had a copy of the indictment and had a good grasp of the issues in the case. Jerejian

recalled specifically discussing with Murphy the possibility of testifying at trial, but Murphy did not want to testify. According to Jerejian, Murphy never provided the names of any alibi witnesses before or during the trial. In discussions with Jerejian, Murphy "could never pinpoint exactly where" he was at the time of the shooting. According to Jerejian, in his discussions with defendant, there was never any doubt or confusion about the date and time of the shooting.

. . .

In an oral opinion placed on the record on September 28, immediately after the hearing, Judge Petrolle found defendant to be a completely incredible witness. He specifically discounted defendant's testimony that he was confused about the date and time of the shooting, and he did not credit defendant's explanation for his late presentation of alleged alibi witnesses. Rather, the judge found that defendant agreed to the strategy of a joint defense in which counsel would focus on discrediting Parker's testimony. He found that defendant never discussed an alibi defense with his attorney before the trial, and that defendant made a voluntary and knowing decision not to testify at his trial.

The judge inferred that the alibi witness affidavits were suspect, because the explanations for their late presentation were unbelievable. However, he also reasoned that the credibility of the affidavits was not the issue before the court on remand. Rather, the issue was whether Jerejian rendered ineffective assistance of counsel. On that point, Judge Petrolle found that Jerejian complied "completely" with his professional obligations as Murphy's defense counsel. He specifically found that Jerejian had no obligation to "make up" an alibi defense, when defendant had not provided him with any information to support such a defense.

. . .

Murphy challenges Judge Petrolle's determination that Jerejian did not render ineffective assistance in failing to present an alibi defense. We cannot agree. Murphy gave a preposterous explanation for his delay in naming alibi witnesses, and Jerejian credibly testified that Murphy did not tell him he had an alibi or ask him to present that defense at the trial. We find no basis to disturb Judge Petrolle's credibility determinations or his factual findings. *See Locurto, supra,* 157 *N.J.* at 474. In light of those findings, we affirm his determination that Jerejian did not provide ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L. Ed.*2d 674, 698 (1984); *State v. Fritz,* 105 *N.J.* 42, 58 (1987).

*State v. Michael Ricks and Darius Murphy*, No. A-2403-10T3, 2013 WL 1187862, at *3-*6 (N.J. Super. Ct. App. Div. Mar. 25, 2013).

The resolution of this claim on appeal, following an evidentiary hearing and fact finding in the PCR trial court, was not an unreasonable application of *Strickland*. The state courts made credibility determinations and found that Mr. Murphy did not, in fact, inform his attorney of an alibi or request that his counsel pursue an alibi defense. Rather, those courts found, Mr. Murphy desired to pursue the joint defense strategy employed at trial. Pursuant to AEDPA, I defer to those factual findings, which Mr. Murphy has not rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Counsel's failure to pursue the purported alibi defense could not have been objectively unreasonable and Mr. Murphy's claim does not satisfy the first prong of *Strickland*. Accordingly, Ground Six will be denied.

    2.  Ground Seven: Failure to Move for a Severance

Mr. Murphy argues that his trial counsel was ineffective for failing to move for a severance. Had the case been severed, he says, he would have been able to introduce the specific facts regarding Parker's other crimes; it was only the risk of prejudice to other defendants, he says, that led the court to preclude that specific evidence. Such evidence, Mr. Murphy asserts, would have revealed Parker's motives to falsely testify in order to secure his cooperation agreement.

The last court to address this claim was the Appellate Division on Petitioner's second PCR appeal. That court addressed the claim as follows:

> [A]lthough the severance issue was not part of the remand, Judge Petrolle took testimony from Jerejian as to why he did not file a severance motion. Jerejian credibly explained that Murphy did not want him to file such a motion, preferring instead to stand trial with his co-defendants.

*State v. Michael Ricks and Darius Murphy*, No. A-2403-10T3, 2013 WL 1187862, at *6 (N.J. Super. Ct. App. Div. Mar. 25, 2013).

The Appellate Division's ruling on this issue was not an unreasonable application of *Strickland*. Of course, no trial strategy can be pursued without forgoing some other, complementary strategy. As discussed above, the state courts determined after an evidentiary hearing and fact finding that Mr. Murphy did not want or seek a severance. Thus, as in the case of Ground Six, counsel could not have rendered objectively unreasonable performance by not filing a severance motion.

Moreover, Mr. Murphy has not demonstrated a reasonable probability that the outcome of his trial would have been different if his attorney had filed a severance motion. The trial court stated that had such a motion been filed, the court would have denied it. (Dkt. No. 13-8 at p. 11-12.) Mr. Murphy also fails to show, beyond speculation, that had the case been severed, the specific facts regarding Parker's other crimes would have been admissible, let alone that they would have changed the outcome of his trial. Finally, as discussed in Section IV.C, above, the defense was given a reasonable opportunity to explore the prior offenses and Parker's motives to lie, and addition of the details of the arrests would not have changed the outcome.

Because this claim fails the *Strickland* test, Mr. Murphy is not entitled to habeas relief. Ground Seven therefore will be denied.

### 3. Ground Eleven: Failing to Excuse Juror B.D.

Mr. Murphy argues that trial counsel was ineffective for failing to use a peremptory challenge to excuse a juror, B.D., whose sister was employed at the prison where Mr. Murphy

was housed during trial. Mr. Murphy asserts that he instructed his counsel that he wanted any

juror with ties to law enforcement to be removed, but counsel did not obey. T

he last court to address this claim was Appellate Division during Petitioner's second PCR

appeal. That court addressed this claim as follows:

> On remand, Judge Michael A. Petrolle, who had not presided over any of
> the prior proceedings in this case, held two separate testimonial hearings.
> The first hearing, concerning the juror issue, was held on May 24, 2010
> and July 1, 2010. Because the transcript of the relevant day of jury
> selection was lost, and because the trial judge and attorneys could not
> reconstruct the record, the judge heard testimony from the juror, B.D., and
> her sister, W.D.
>
> The May 24, 2010 hearing began with testimony from W.D., who
> confirmed that she had been an Essex County corrections officer from
> 1978 to 2006. She also provided the court with her sister B.D.'s home
> address. According to W.D., her sister told her that she had been called for
> jury duty and had been selected to serve on a jury. W.D. testified that she
> had previously worked as a guard at the jail. However, at the time B.D.
> began her jury service, W.D. held the title of corrections officer but was
> working as a "social worker" in the jail library. She did not wear a
> uniform, and her role "was to address the needs of the inmates as they
> were privileged to come up to the library to inquire about court dates,
> getting into contact with their Public Defenders, [and] getting certain
> papers that may have been needed for court signed." W.D. testified that,
> prior to B.D.'s jury service, she had told B.D. about both of her
> assignments. In other words, B.D. knew that W.D. was a corrections
> officer who had at one time worked as a jail guard, but also knew she was
> acting as a social worker at the time of B.D.'s jury service.
>
> The judge conducted the questioning but permitted all counsel to propose
> follow-up questions, which the judge then directed to W.D. The judge
> followed the same procedure when B.D. testified at the next hearing day,
> on July 1, 2010.
>
> . . .
>
> At the July 1 hearing, B.D. testified that during voir dire she and the other
> jurors were asked questions by the judge. She remembered that, during
> voir dire, she disclosed that her sister W.D. "was a correctional officer."
> She did not recall whether anyone asked where her sister worked as a
> corrections officer. In response to Judge Petrolle's inquiry, none of the
> attorneys proposed asking B .D. any additional questions. They all agreed

that B.D.'s testimony was clear on the critical issue of disclosure. None of the attorneys sought to present additional testimony or other evidence on the issue.

Immediately after the hearing, Judge Petrolle placed an oral opinion on the record, finding as fact that in response to the voir dire conducted during defendants' trial, B.D. disclosed that she had "a sister who was a corrections officer." He therefore denied Ricks's PCR petition, which only raised the juror disclosure issue, and denied Murphy's PCR petition with respect to that issue.

At the next hearing, on September 28, 2010, the judge heard testimony from Murphy and his former trial attorney, concerning Murphy's claims of ineffective assistance of counsel. Murphy testified that during jury selection he told his attorney he wanted him to excuse any juror "with ties to law enforcement." However, his attorney failed to exercise a peremptory challenge with respect to B.D.

. . .

Addressing the juror B.D., Jerejian did not remember her voir dire. He testified that he would not have automatically excused a juror based solely on that juror having a relative in law enforcement. Instead, based on his extensive experience picking juries, he would evaluate whether that individual juror would be "a good juror." However, Jerejian testified that if his client had adamantly indicated that he wanted a juror to be excused, he would have exercised a peremptory challenge to excuse that juror.

. . .

Further addressing B.D., Judge Petrolle found it incredible that defendant remembered that juror, as he claimed. He found "no basis" to conclude that there was any ineffective assistance of counsel in allowing B.D. to remain on the jury and found "no basis whatsoever for believing the testimony that the defendant wanted the juror excluded."

. . .

As previously discussed, we find no basis to second-guess Judge Petrolle's factual finding that B.D. disclosed her sister's employment as a corrections officer. The judge found Jerejian's testimony entirely credible, and found Murphy's testimony completely unbelievable. In light of those credibility determinations, there is no basis to find that Jerejian rendered ineffective assistance of counsel in deciding not to use a peremptory challenge to remove B.D. as a juror.[Fn.]

> [Fn] While Jerejian did not remember B.D., a reasonable trial
> counsel might have concluded that, because her sister was assigned
> as a social worker helping inmates, the usual reasons to exclude
> relatives of corrections officers might not apply to B.D.

*State v. Michael Ricks and Darius Murphy*, No. A-2403-10T3, 2013 WL 1187862, at *2-*6 (N.J.

Super. Ct. App. Div. Mar. 25, 2013).

The Appellate Division's denial of this claim was not an unreasonable application of

*Strickland* and it was not based on an unreasonable determination of the facts. As with Grounds

Six and Seven, I defer to the state courts' factual findings on this issue. The PCR court held

hearings on this issue and concluded that Mr. Murphy's testimony was not credible. That court

found that Mr. Murphy did not, in fact, remember B.D. and did not want her excluded from the

jury. Given these facts, the Appellate Division's affirmance of the PCR court's conclusion that

Mr. Murphy's trial counsel did not provide ineffective assistance on this matter was reasonable.

Moreover, Mr. Murphy again fails to satisfy the prejudice prong of *Strickland* because he

has not demonstrated a reasonable probability that the outcome of his trial would have been

different if B.D. had been removed from the jury. Nor does he overcome the *Strickland*

presumption that counsel's choices were strategy-based. B.D.'s status as a social worker (as

opposed to say, a prison guard) would furnish a reasonable basis to refrain from spending a

peremptory challenge on her.

Mr. Murphy is therefore not entitled to habeas relief on this claim and Ground Eleven

will be denied.

G. Ground Nine: Prosecutor's Failure to Disclose Statement of Keith Henderson

In Ground Nine, Mr. Murphy asserts that the prosecutor violated his due process rights by

failing to disclose to the defense statements made by Keith Henderson. Henderson, a co-

defendant who has since passed away, allegedly stated that Mr. Murphy and two other co-defendants were not involved in the crimes for which they were tried.

At the joint sentencing, Mr. Henderson attacked the credibility of the cooperating witness, Parker, and accused the judge of bias. He referred to "individuals who have been implicated in this file that hadn't anything to do with this crime and there are people who have something to do with this crime that was never arrested." He went on to state that he "even told the Prosecutor's Office that what are they going to do now that you convicted three innocent people, what are they going to do when this guy, who was with us, who still has the weapon, when he gets locked up . . . and then when you find that this man looked similar to Mr. Murphy, I'm saying what is the Prosxecuto's Office going to do." Henderson complained that the prosecutors "wouldn't give [him] the plea bargain that they offered [him] unless [he] testified to the factual basis of what Mr. Parker said." (Sentencing Tr. 44-45, ECF no. 12-13 at 15-16)

It was at the sentencing hearing, Mr. Murphy asserts, that he first heard Mr. Henderson's exculpatory statements. On direct appeal, Mr. Murphy challenged the denial of his motion for a new trial based on newly discovered evidence, namely, Mr. Henderson's statement, but he did not raise the constitutional due process issue.

Mr. Murphy did raise the due process issue during his PCR proceedings. The PCR court denied the claim somewhat obliquely, finding that Mr. "Henderson never expressed, either directly or through counsel, any indication to the court that he would testify on Murphy's behalf."

On appeal from the denial of PCR, the Appellate Division addressed the claim as follows:

> This issue was not directly addressed by the PCR judge. However, the PCR judge did address Henderson's testimony in his discussion of severance. The judge stated that, "Henderson never expressed, either

directly or through counsel, any indication to the court that he would testify on [defendant's] behalf."

We also note that, the statements that defendant now argues qualify as newly discovered evidence, were made by a co-defendant, Henderson, while addressing the judge immediately prior to sentencing. These statements at sentencing are the only evidence that defendant can offer as to what Henderson's testimony would have been. The statements are equivocal and vague. Moreover, they were made after the joint trial was over.

Defendant has submitted the certifications of: Henderson's brother, Matthew Henderson; mother, Doris Henderson; and cousin, Jerome Gary, to the effect that Henderson told them that defendant was not involved in the robbery/murder. These hearsay statements attributed to Henderson are not admissible because Henderson is now deceased and no recognized hearsay exception applies. Therefore, they cannot be the basis for a new trial motion.

For newly discovered evidence to require a new trial in a matter, "defendant must show that the evidence is 1) material, and not 'merely' cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was not 'discoverable by reasonable diligence beforehand'; and 3) that the evidence 'would probably change the jury's verdict if a new trial were granted." ' *State v. Ways,* 180 N.J. 171, 187 (2004) (quoting *State v. Carter,* 85 N.J. 300, 314 (1981)). Furthermore, in reviewing new evidence claims, "[a] jury verdict rendered after a fair trial should not be disturbed except for the clearest of reasons." *Id.* at 187-88. For that reason, "[n]ewly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material is of sufficient weight that it would probably alter the outcome of the verdict in the new trial." *Ibid* .

State v. Murphy, No. A-0708-04T4, 2007 WL 1468592, at *4-5 (N.J. Super. Ct. App. Div. May 22, 2007).

The Supreme Court has held that the prosecution has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key prosecution witness. *See Kyles v. Whitley,* 514 U.S. 419, 433 (1995); *Giglio v. United States,* 405 U.S. 150 (1972); *Brady*

*v. Maryland,* 373 U.S. 83 (1967). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also Kyles,* 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); *California v. Trombetta,* 467 U.S. 479, 488–89 (1984) (state's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory); *United States v. Agurs,* 427 U.S. 97, 112 (1976) ("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed").

Here, Mr. Murphy claims that the prosecutor failed to disclose to the defense Mr. Henderson's statement that Mr. Murphy and others were not involved in the crimes for which they were tried. However, a joint defense was employed in this case. The statement at issue was made by a co-defendant after the trial was over. There was no evidence it was disclosed to the prosecutors in time for its disclosure before or at trial. The circumstances do not establish that the prosecution in any way suppressed the statement or knew of its substance before Mr. Henderson spoke at the sentencing hearing.

In addition, Mr. Henderson was a co-defendant with Mr. Murphy, and they were pursuing a joint defense strategy. His account of the offense was surely available to Mr. Murphy at any time. Henderson, like Murphy, fought the charges at trial in the hope of an acquittal. There is no indication that at any time before his conviction, Mr. Henderson was willing to waive his own Fifth Amendment privilege, testify at trial, and possibly inculpate himself for Murphy's benefit, except possibly in return for a substantial benefit to himself.[3]

As for the evidence itself, the Appellate Division found that the statement would not constitute newly discovered and admissible evidence and therefore could not sustain a motion for a new trial. This determination was made on the basis of state law and is not reviewable on a petition for habeas relief. I consider, however, the Appellate Division's assessment of the statement as vague and unlikely to change the trial result. Henderson stated at sentencing that another unnamed person was the truly guilty party, but gave no corroborating detail or even a name, beyond the contention that the person looked like Murphy.

Based on the record before this Court, Mr. Murphy is not entitled to federal habeas relief on this claim. Ground Nine will therefore be denied.

## H. Ground Ten: Ineffective Assistance of Appellate Counsel

In Ground Ten, Mr. Murphy argues that his appellate counsel was ineffective for failing to raise on appeal the ineffective assistance of trial counsel. Petitioner raised this argument in his PCR proceedings. Although Mr. Murphy raised this claim on the second appeal from the denial

---

[3]     Even Murphy's version does not suggest that the government acted improperly or was not pursuing legitimate interests. The prosecution was not obligated to reduce the charges against (or immunize) a guilty party to permit him to testify in a manner it considered false in light of the other evidence it had gathered. Murphy has not proffered any evidence that the prosecution exceeded its charging discretion and affirmatively interfered with Henderson's decision whether to testify; that it deliberately distorted the fact-finding process; or that the somewhat vague statements of Henderson, an admitted co-felon, were essential or clearly exculpatory. *Cf. United States v. Quinn*, 728 F.3d 243 (3d Cir. 2013).

of his PCR petition (*see* Dkt. No. 15-2 at p. 29), the Appellate Division did not discuss it in its opinion. I will therefore consider this claim *de novo*. *Rolan*, 445 F.3d at 678.

The Sixth Amendment right to counsel for criminal defendants includes the right to effective assistance of counsel on a defendant's first appeal. *Evitts v. Lucey*, 469 U.S. 387, 394-97 (1985). I have already found that Mr. Murphy's ineffective assistance of trial counsel claims lack merit. Consequently, the claim that his appellate counsel was ineffective for failing to raise those same claims on appeal must also fail. Appellate counsel is not required to "advance *every* argument, regardless of merit, urged by the appellant." *Evitts*, 469 U.S. at 394. Mr. Murphy cannot establish that he was prejudiced, under the *Strickland* test, by his appellate counsel's failure to press meritless claims. Mr. Murphy is therefore not entitled to habeas relief on this claim. Accordingly, Ground Ten will be denied.

I.   Ground Twelve: Irregular Influences During Jury Selection

In Ground Twelve, Mr. Murphy asserts that he was denied the right to a fair trial and was prejudiced as a result of irregular influences during jury selection. During the PCR proceedings, as discussed above, Petitioner addressed the juror issue as part of his ineffective assistance of counsel claims. Petitioner asserted that the juror B.D. did not disclose that her sister worked at the correctional facility in which Petitioner was being held. Though he offers no factual support, Petitioner implies that his trial was unfair because of potential juror bias or irregular influence.

The last court to discuss this issue was the Appellate Division on Petitioner's second PCR appeal. That discussion is quoted above with respect to Ground Eleven. The state courts concluded that B.D. did disclose that her sister worked as a corrections employee. Mr. Murphy has not cited or pointed to any evidence of bias or irregular influence resulting from B.D.'s presence on the jury. *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (a defendant must

demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality") (citation omitted). His unadorned, fact-free claim that he was prejudiced and denied a fair trial, without more, does not set forth a sufficient basis to state a claim for habeas relief. Ground Twelve will therefore be denied.

J.   Ground Thirteen: Incomplete Verbatim Record of Jury *Voir Dire*

In Ground Thirteen, Petitioner argues that he was prejudiced by the incomplete verbatim record of the jury *voir dire* and that the state court erred in failing to reconstruct the lost record. Petitioner raised this issue during the course of his PCR proceedings.

On Petitioner's first PCR appeal, the Appellate Division discussed this claim and ordered a remand for the purpose of finding the record, reconstructing the record, or, if necessary, conducting a *voir dire* of B.D.:

> Five years after his conviction, defendant learned that Juror B.D .'s sister was a guard at the Essex County Jail. Defendant ordered the transcript of this particular jury voir dire. However, he was advised that the transcript was not available. Thus, it is unknown if Juror B.D. disclosed during jury selection that her sister was in law enforcement. Defendant requested that the court order an inquiry of all female staff members at the Essex County Jail to see if anyone was related to Juror B.D.. We disagree that such a wide ranging inquiry is needed.
>
> First, a more intensive and thorough search must be made to locate the transcript of the second day of jury selection. Trial courts and attorneys make a concerted effort to "create a record." This is not an empty exercise. The transcripts of such record should be carefully indexed and stored by court personnel. Second, if the transcript cannot be located, the trial judge and counsel should try to reconstruct the record in accordance with *R.* 2:5-3(f). The focus of the inquiry is to determine whether Juror B.D. disclosed her connection to the sister who worked as a jail guard at the time of trial and whether she indicated that this would or would not affect her judgment. Failing this, the court should voir dire Juror B.D.
>
> In conducting this inquiry, the judge should be mindful that a defendant's right to a fair and impartial jury is fundamental. *State v. Tyler,* 176 N.J. 171 (2003); *State v. Williams,* 190 N.J.Super. 111, 114 (App.Div.1983). New Jersey courts have repeatedly "invalidated judgments where a juror's

41

inaccurate answer to a question propounded in the jury voir dire precluded a litigant from exercising a peremptory challenge. *State v. Scher*, 278 N.J. Super. 249, 263 (App.Div.1994), *certif. denied*, 140 N.J. 276 (1995) (citing *Wright v. Bernstein*, 23 *N.J.* 284 (1957); *State v. Williams*, 190 *N.J.Super.* 111 (App. Div. 1983); *State v. Thompson*, 142 N.J. Super. 274 (App. Div. 1976)). More importantly, defendant must demonstrate that, "had he or she known of the omitted information, he or she would have exercised a peremptory challenge to exclude the juror." *State v. Cooper*, 151 *N.J.* 326, 349 (1997), *cert. denied*, 528 U.S. 1084, 120 S. Ct. 809, 145 L. Ed.2d 681 (2000) (citing *Wright, supra*, 23 N.J. at 294); *see also State v. Farmer*, 366 N.J. Super. 307, 321 (App.Div.), *certif. denied*, 180 *N.J.* 456 (2004) (Payne, J.A.D., concurring) (citing a line of cases that hold that omission or falsification of information by a juror during voir dire will constitute grounds for reversal of a conviction without a showing of prejudice if it can be shown that a peremptory challenge would have been utilized to excuse a juror. *Id.* at 321 (citations omitted)). Absent this showing, "the voir dire omission is harmless [,] ... because if a litigant would not have challenged the juror, the litigant could not have been prejudiced." *Cooper, supra*, 151 *N.J.* at 350.

*Murphy*, 2007 WL 1468592, at \*2.

On Mr. Murphy's second appeal, the Appellate Division found that no claim of error

emerged from the trial court's attempted reconstruction of the record:

> [Co-defendant] Ricks asserts, in vague and general terms, that Judge Petrolle should have done something more to reconstruct the record. We find no merit in that contention. It is clear that the court and counsel made exhaustive but unsuccessful efforts to reconstruct the record. We find no error in the procedure Judge Petrolle followed, in taking the testimony of B.D. and her sister. We note that during the September 10 hearing, Judge Petrolle even went beyond what our remand required, and allowed Jerejian to be questioned about B.D. That questioning produced no evidence helpful to the defense.

*Michael Ricks*, 2013 WL 1187862, at \*5.

"[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal

trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992). In the field of criminal law, "the category

of infractions that violate 'fundamental fairness' [is defined] very narrowly based on the

recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due

Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992). In order to satisfy due process, Petitioner's trial must have been fair, but it need not have been perfect. *United States v. Hasting*, 461 U.S. 499, 508-09 (1983) ("[T]here can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial.").

Here, the Appellate Division remanded Mr. Murphy's original PCR petition and ordered the trial court to attempt to reconstruct the record of the jury *voir dire*. Failing that, it was to recall B.D. and conduct a fresh *voir dire* of her. The trial court held four hearings on Mr. Murphy's PCR petition and conducted the *voir dire* and reconstruction of the record. That court also made a factual determination that B.D. had in fact disclosed her family connection in connection with jury selection, and that Mr. Murphy had not in fact wanted B.D. excluded from the jury. The Appellate Division affirmed.

I find that the Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established federal law. Nor was its decision based on an unreasonable determination of the facts. Accordingly, Mr. Murphy is not entitled to federal habeas relief and Ground Thirteen will be denied.

K. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003). Applying this standard, this Court rules that a certificate of appealability shall not issue in this case.

## V.     CONCLUSION

For the foregoing reasons, Mr. Murphy's habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.

Dated: January 3, 2018

KEVIN MCNULTY
United States District Judge